# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

**DOCKET NO. 3:07-cv-00021-FDW**

| | |
|---|---|
| JOHNNIE MAE ROBINSON, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>PRESBYTERIAN WOUND CARE )<br>CENTER, )<br>)<br>Defendant. )<br>) | **ORDER** |

THIS MATTER comes now before the Court upon Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Doc. No. 34). The Court has provided Plaintiff, who is proceeding pro se, with notice of her responsibilities under Rule 56, namely that she "may not rely merely on allegations or denials in [her] own pleading; rather, [her] response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If [she] does not so respond, summary judgment should, if appropriate, be entered against [her]." (Doc. No. 46.) Plaintiff responded by filing several of her own affidavits. (Doc. Nos. 48-49.) On April 10, 2008, the Court heard nearly two hours of oral argument, expanding the time originally allotted to ensure Plaintiff's understanding participation. At oral argument, Plaintiff raised new allegations which the Court felt required further development. Because of Plaintiff's pro se status, the Court provided Plaintiff with two weeks to support her allegations with a sworn affidavit, which she did. (See Plaintiff's Aff., Doc. No. 52.) The Court then reopened discovery for a limited period of two weeks regarding this new allegation. Having

considered Defendant's Motion and supporting materials, Plaintiff's affidavits, and having heard oral argument in this case, the Court is now prepared to rule on the Motion.

## FACTUAL BACKGROUND

Plaintiff was employed at Presbyterian Hospital, d/b/a Presbyterian Wound Care Center ("WCC"), as a Certified Nursing Assistant II ("CNA II") from November of 1999 to September 1, 2005. On September 1, 2005, Plaintiff was moved from her CNA II position to the Patient Service Coordinator position in the Medical Records department. Despite this change in position, Plaintiff's hours, salary, and benefits remained the same. Plaintiff's employment with Defendant ended when she was terminated on September 23, 2005.

According to Plaintiff, "All my problems started when Wendy George came in contact with me. Wendy just didn't like me . . . . I became a target for Wendy." (Plaintiff's Dep., Doc. No. 39, at 37.) During the relevant time of 2005, Wendy George was a registered nurse working as a manager for Meridian Healthcare[1] who was brought into the WCC to help improve efficiency and organization. Apparently, the WCC had little supervision prior to Ms. George's arrival, and the staff "had loosely set work hours, roles within the clinic that were not well defined and no set procedures for handling patient flow." (Pickett Aff., Doc. No. 37, at ¶ 4.) Ms. George was therefore brought in "to come up with a plan to more effectively run the WCC." (Id. at ¶ 6.) Ms. George's new policies and procedures were met with opposition from several WCC employees. According to Defendant, several registered nurses left voluntarily due to the changes. (Id.) Defendant's affidavits state that Plaintiff, in particular, had difficulty with the new policies and procedures. For example, Plaintiff was repeatedly told to use the portable blood pressure machine in a central area of the WCC

---

[1]An affiliate of Presbyterian Hospital.

so that all of the employees could have access to it. Plaintiff, however, failed to follow these instructions and took the blood pressure machine into patient rooms, making it difficult for others to locate and use the machine. (Smith-Hill Aff., Doc. No. 42, at ¶ 11; George Aff., Doc. No. 41, at ¶ 9.) Defendant's affidavits further state that Plaintiff "had problems with documentation of patient information. She also moved at a slower pace than desired because she spent a significant amount of [time] socializing with patients [which] impeded patient flow within the WCC." (Pickett Aff., Doc. No. 37, at ¶ 8.) Ms. George informally counseled with Plaintiff several times concerning these difficulties. (Id. at ¶ 9; George Aff., Doc. No. 41, at ¶ 9.)

Plaintiff has maintained in her deposition, in her response to Defendant's Motion, and at oral argument that Wendy George terminated Plaintiff for discriminatory reasons and out of personal animus. Plaintiff said in her deposition that Ms. George "was not respectful to me" and that she was a "very vindictive-type person." (Plaintiff's Dep., Doc. No. 39, at 15-16.) Plaintiff also said that "nothing was positive with this woman. You know, evidently, she had some issues with herself and everybody else." (Id. at 26.) Regarding Ms. George's policy changes, Plaintiff stated that "everything changed how Dr. Hay had us to do it. [Ms. George] did it more like—that I feel the way she did it was based on how her staff did things. So she tried to, I guess, utilize it to the best of her ability to get the flow to flow the way her patients that they saw each day did." (Id. at 22.) Of one particular change requiring certain documentation, Plaintiff stated, "And at the end of the day, we had to turn these forms in like we were school children. And [Ms. George] would criticize if she thought that the time frames were not accurate enough to her benefit. And that's what she did to us, ongoing." (Id. at 25.) When asked about Ms. George's expectations that patient time be reduced, Plaintiff stated, "It just couldn't be done." (Id. at 23.)

On September 7, 2005, Ms. George held a meeting in which she gave a PowerPoint presentation concerning the new performance expectations. Each employee was given a copy of the new guidelines and asked to sign it within one week. Plaintiff did not return her copy of the guidelines within the week and was reminded on September 14, 15, and 16 to sign and turn in the guidelines. (Smith-Hill Aff., Doc. No. 43, at ¶ 13; Pickett Aff., Doc. No. 37, at ¶ 12; George Aff., Doc. No. 41, at ¶ 11.) Of this failure to return the signed guidelines, Plaintiff stated, "[I told Ms. George] that I wanted to have time to read what I'm signing, and then I would give it to her." (Plaintiff's Dep., Doc. No. 39, at 57.) When asked again by Ms. George, Plaintiff responded, "I'm only human, people do forget." (Id. at 58.) On September 21, 2005, Plaintiff was told that if she did not return the signed guidelines by 5:00 p.m. that day, she would be terminated. (George Aff., Doc. No. 41, at ¶ 13.) At this point, Plaintiff informed Ms. George that she had made use of Presbyterian's Employee Relations program and had complained about Ms. George's treatment of her. (Id.; see also Holder Aff., Doc. No. 45, at ¶¶ 5-7.)

Defendant moved Plaintiff from her CNA II position to Medical Records on September 1, 2005, because of her "inability to follow the new policies" and because she "chose to do things her own way instead." (Pickett Aff., Doc. No. 37, at ¶ 9.) According to Defendant, this move was "an evaluative period in which [Plaintiff] could be monitored and given the opportunity to improve her ability to follow instructions." (Id. at ¶ 10; George Aff., Doc. No. 41, at ¶ 10.) Plaintiff, however, alleges that she was specifically told she would not get her CNA II position back because of her difficulty in adapting to the new policies. (Plaintiff's Dep., Doc. No. 40, at 99.) Defendant's affidavits show that while working in Medical Records, Plaintiff repeatedly failed to pull patient charts each morning. (George Aff., Doc. No. 41, Ex. 5 at ¶ 12.) The first entry under the "Duties"

section of the Medical Records position is to "[p]ull charts for the following day appointments every am . . . ." (George Aff., Doc. No. 41, Ex. A.) When Ms. George asked Plaintiff why she was not pulling the charts every morning, Plaintiff allegedly asked "why the charts had to be pulled in the morning so long as they were pulled before Plaintiff went home." (George Aff., Doc. No. 41, at ¶ 12.) Plaintiff, however, has submitted an affidavit stating that she "had never failed to pull the patient's charts . . . [and] [t]here had never been a time when I forgot to pull the charts, before or after Wendy George became the manager." (Plaintiff's Aff., Doc. No. 52, at ¶¶ 3, 9.) On September 16, 2005, Ms. George gave Plaintiff an oral warning for failing to pull the charts in the morning (Doc. No. 41, Ex. B), which Plaintiff refused to sign, saying "if it's something I'm feeling I'm not guilty of, then I'm not going to sign it" (Plaintiff's Dep., Doc. No. 39, at 82). On September 21, 2005, Plaintiff was given a written warning for similar behavior. (Doc. No. 41, Ex. C.) Finally, on September 23, 2005, Plaintiff was terminated for failing to pull the medical records charts in the morning. (See Pickett Aff., Doc No. 37, at ¶ 14; George Aff., Doc. No. 41, ¶ 14; Discharge Form, Doc. No. 41, Ex. D.)

In response to her termination for failing to pull the medical records charts, Plaintiff stated, "Wendy just tells a bunch of lies on me," (Plaintiff's Dep., Doc. No. 40, at 87) and "Wendy is just a liar" (id. at 91). During oral argument, the Court asked Plaintiff to respond to Defendant's affidavits and exhibits concerning her failure to pull the charts and subsequent discharge. Plaintiff responded by saying that she had pulled the charts and that Ms. George, in an effort to get Plaintiff fired, took the charts from where Plaintiff had placed them. When asked if she had any evidence, in the form of witnesses, affidavits, or otherwise in support of such a claim, Plaintiff responded that she did not, but was adamant that she had pulled the charts. Because the Court felt that this issue

needed to be developed further, it gave Plaintiff two weeks to submit a sworn affidavit containing this allegation. Plaintiff did so, stating, "Approximately 8 a.m. or 8:15 a.m., each morning, I routinely, pulled the patients [sic] charts and September 23, 2005 was no different. I believe that Wendy George took the charts from the designated place in my office and put them in her office. I know I pulled those charts." (Plaintiff's Aff., Doc. No. 52, at ¶ 11.)[2]

Around the time Plaintiff was moved from her CNA II position to Medical Records, Kathy Vinson, a Caucasian female under forty years of age, was hired to work at the WCC as a Medical Office Assistant ("MOA"). The significance of Ms. Vinson's arrival is disputed by the parties. Defendant stated that Ms. Vinson, along with Ms. Anabell Carjaval, a Hispanic female under forty years of age, was hired as an MOA, not a CNA, and was the replacement for certain outgoing registered nurses as a part of the WCC's restructuring. Defendant argues that Ms. Vinson's status as an MOA, rather than a CNA, precludes a finding that she replaced Plaintiff. Plaintiff, however, stated in her deposition and before the Court at oral argument that Ms. Vinson was performing Plaintiff's CNA duties after Plaintiff was moved to Medical Records.

### PROCEDURAL BACKGROUND AND LEGAL STANDARD

Plaintiff, after following the proper procedures with the Equal Employment Opportunity Commission and obtaining a right-to-sue letter, filed a complaint in this Court asserting four causes of action: (1) discrimination based on race, (2) discrimination based on gender, (3) discrimination

---

[2]The Court, anticipating Defendant's objection to the timeliness of this affidavit, stated that it "recognizes that this delay may inconvenience Defendant, but [its] duty to pro se plaintiffs must outweigh that inconvenience." (Doc. No. 51 at 2-3.) See Haines v. Kerner, 404 U.S. 519, 520 (1972) (detailing a court's duty to hold pro se plaintiffs to less stringent standards); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985) (holding that a pro se plaintiff's difficulty articulating his grievance "need not detour the district court from resolving that which the litigant himself has shown to be his real concern").

based on age, all in violation of Title VII of the Civil Rights Act of 1964, and (4) retaliation against her for her efforts to enforce her rights under Title VII. Defendant has answered Plaintiff's Complaint and has moved for summary judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the Court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, Plaintiff in this case, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Plaintiff "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

## ANALYSIS

**A. Race, Gender, and Age Discrimination**

Plaintiff may avert summary judgment and establish a claim for race, gender, or age discrimination through one of two avenues. "First, a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex[, gender,] or age discrimination motivated the employer's adverse employment decision." Hill v. Lockheed Martin Logistics Management, Inc., 354 F.3d 277, 284 (4th Cir. 2004). Plaintiff, however, has presented neither direct nor circumstantial evidence that race, gender, or age were motivating factors for her termination. Under the second, "pretext" framework, Plaintiff must establish a prima facie case of discrimination and then demonstrate that the employer's permissible reason for an adverse employment action is actually pretext for discrimination. Id. at 285. More specifically, this framework, originating with McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), proceeds as follows:

> At the first step the plaintiff has the burden to establish a prima facie case. A Title VII plaintiff using the standard formulation for the prima facie case meets this burden by showing that: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." If the plaintiff establishes her prima facie case, the burden shifts to the employer at the second step "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." At the third step the burden returns to the plaintiff to show that "the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." Specifically, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination."

Lettieri v. Equant Inc., 478 F.3d 640, 646 (4th Cir. 2007) (quoting Hill, 354 F.3d at 285); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)) (citations omitted).

It is undisputed by the parties that Plaintiff, an African American female over the age of forty, satisfies the first part of the McDonnell Douglas framework. Similarly, it is undisputed that Plaintiff was terminated and that this termination was an adverse employment action.[3] Thus, the disputed issues in Plaintiff's prima facie case are whether Plaintiff was performing her job duties at a level that met Defendant's legitimate expectations at the time of her termination and whether Ms. Vinson, a Caucasian woman under forty, was hired as Plaintiff's replacement.

Regarding the first disputed factor, Defendant argues that "there is unrefuted evidence that Plaintiff was not performing her duties at a level that met her employer's legitimate expectations." (Doc. No. 56 at 5.) This "unrefuted evidence" comes in the form of the oral documented warning, the writing warning, and Plaintiff's ultimate discharge. Defendant contends that these warnings, along with the affidavits of Jan Pickett and Wendy George, indicate "Plaintiff's failure to follow instructions from her supervisor regarding new department policies and procedures and Plaintiff's failure to execute and return the signed, written department guidelines in a timely fashion . . . ." (Doc. No. 56 at 2.) The Court, however, does not think that these disciplinary actions taken by Defendant are as "unrefuted" as Defendant believes. Plaintiff herself has refuted them on several occasions. First, Plaintiff failed to sign the documentation of the oral warning, saying, "if it's something I'm feeling I'm not guilty of, then I'm not going to sign it." (Plaintiff's Dep., Doc. No.

---

[3] Plaintiff also contended that her move to Medical Records was an adverse employment action. The Court disagrees, primarily because Plaintiff's salary, benefits, and hours remained the same. See Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007). Thus, the Court proceeds to discuss only Plaintiff's termination.

39, at 82.) Regarding the other allegations of insubordination and failure to follow procedures, Plaintiff has stated that "Wendy just tells a bunch of lies on me," (Plaintiff's Dep., Doc. No. 40, at 87) and "Wendy is just a liar" (id. at 91). Finally, regarding the ultimate reason for Plaintiff's termination, her failure to pull the medical records charts on the morning of September 23, 2005, Plaintiff has categorically denied that she failed to pull the charts. (Plaintiff's Aff., Doc. No. 52, at ¶¶ 3, 6, 8-11.)[4]

Defendant has described Plaintiff's affidavit as "self-serving and conclusory" and argues that it does nothing to refute Defendant's affidavits. However, as a recent unpublished opinion from the United States Court of Appeals for the Fourth Circuit states, "In viewing the record in the light most favorable to the nonmovant, we assume the credibility of the plaintiff's evidence unless it is facially incredible. That the plaintiff herself is the source of forecasted testimony is not sufficient to discredit it as a matter of law." Willis v. Town of Marshall, No. 07-1404, 2008 WL 1897528, at *7 n.4 (4th Cir. April 30, 2008). Questions of fact, such as what Plaintiff did or did not do and when she did it, may be properly supported by her own affidavit. See id. ("Here, the question of how many warnings Willis received is one of fact, not opinion.") Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court holds that a reasonable jury could find that Plaintiff is telling the truth and that she was, in fact, performing her duties at a level that met Defendant's legitimate expectations.

---

[4]Plaintiff has also produced several positive employment reviews from 1999 to 2004. However, the Fourth Circuit has made it clear that looking at whether an employee met her employer's legitimate expectations prior to the events that sparked the termination is an "unworkable" approach because "[t]he further back in time a court goes to evaluate an employee's performance, the more removed the evidence is from the time of the termination." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 516 (4th Cir. 2006). Thus, the Court has not relied upon these previous employment reviews.

The second disputed element of <u>McDonnell Douglas</u> is whether Plaintiff's CNA II position remained open or was filled by a similarly qualified applicant outside of Plaintiff's protected class. Defendant argues that Ms. Vinson, the Caucasian female under forty who was hired subsequent to Plaintiff's move to Medical Records, could not have been a replacement for Plaintiff because she was an MOA, not a CNA. Defendant contends it hired two MOAs to replace certain registered nurses as part of an overall restructuring. In response, Plaintiff argues that Ms. Vinson was performing all of Plaintiff's former CNA duties and that form should not govern over substance. The Court agrees with Plaintiff. <u>McDonnell Douglas</u> does not require that the replacement be *exactly* qualified, just that he or she be *similarly* qualified. Defendant has proffered the fact that an MOA can administer shots, while a CNA cannot. (Doc. No. 35 at 7.) This fact is enough to show that Ms. Vinson's duties and qualifications were not exactly the same as Plaintiff's, but, standing alone, hardly seems sufficient to show that they were not similar. Furthermore, the fact that Plaintiff observed Ms. Vinson working in Plaintiff's former station, performing all of Plaintiff's former duties, persuades the Court that Plaintiff has met her prima facie burden that Ms. Vinson was a similarly qualified individual, outside of Plaintiff's class of race and age, hired to fill Plaintiff's position.

However, Ms. Vinson, a female, is not outside of Plaintiff's gender. Thus, it appears as if Plaintiff is unable to satisfy this element of the prima facie case for gender discrimination. In her deposition, Plaintiff was asked, "Do you believe you were discriminated against because you were a woman?" to which Plaintiff responded, "How could that be a fact, because everybody that worked there was a woman?" (Plaintiff's Dep., Doc. No. 40, at 122.) When further pressed as to whether she was discriminated against based on her gender, Plaintiff replied, "Not by being a woman, no."

(Id. at 123.) During oral argument, Plaintiff seemed to suggest that although she was not discriminated against because she was a female, she was discriminated against because she was an African-American female. Plaintiff was unable to supply any authority for this conjunction of both race and gender into one protected class, and the Court is unaware of any such authority. Plaintiff's claim of race discrimination is separate and distinct from her claim of gender discrimination, and a prima facie case for each must be established. Because Plaintiff has been unable to demonstrate that her position was filled by someone outside her gender, she has failed to establish a prima facie case of gender discrimination. As such, the Court holds that there are no genuine issues of material fact as to gender discrimination and that Defendant is entitled to summary judgment as a matter of law as to that claim.

Plaintiff has established a prima facie case for race and age discrimination, and the burden now shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. Lettieri, 478 F.3d at 646. Defendant has put forward several affidavits, including those of Janet Smith-Hill, Jan Pickett, Wendy George, and Joanna Holder, along with the documentation of oral and written disciplinary actions taken by Defendant against Plaintiff. This evidence, if uncontroverted, shows that Plaintiff was frequently in conflict with Ms. George's new policies for the WCC. The instances involving the portable blood pressure machine and the guidelines form are specific examples of this conflict. There is also the final reason for Plaintiff's termination, namely the failure to pull medical records charts as required by the guidelines. Based on the circumstances of the blood pressure machine, the written guidelines form, and the failure to pull the medical records charts, Defendant followed a structured disciplinary procedure, first giving Plaintiff an oral warning on September 16, 2005, followed by a written warning on September 21, 2005. Plaintiff's

discharge form indicates that she was terminated on September 23, 2005, after again failing to pull the medical records charts. This record satisfied Defendant's burden to demonstrate a legitimate, nondiscriminatory reason for Plaintiff's termination.

Under the final step of the McDonnell Douglas framework, the burden returns to Plaintiff to show, by preponderance of the evidence, that Defendant's proffered legitimate reason for taking an adverse employment action is actually a pretext for race, gender, or age discrimination. Id. at 646. Plaintiff's initial affidavits, submitted to the Court before oral argument, failed to do so. They consisted mainly of positive employment reviews during the period of 1999-2004 and said nothing of Defendant's reasons for her termination. However, when pressed at oral argument as to the legitimacy of Defendant's nondiscriminatory reasons for her termination, Plaintiff responded with a new allegation. She stated that she had, in fact, pulled the medical records charts, and that Ms. George must have gone into Plaintiff's office and clandestinely removed the charts from Plaintiff's office to her own. The Court was reluctant to proceed on such a serious charge without more than an unsworn statement at oral argument, but felt that this allegation could be the basis for a genuine issue of material fact if properly supported. Thus, the Court gave Plaintiff two weeks to adequately support her allegation, which, as previously mentioned, she has.

Defendant has attacked Plaintiff's affidavit on several grounds. First, Defendant argues that Plaintiff's affidavit is contradicted by her other statements and her own witness. One of Defendant's exhibits is a record of Plaintiff's call to the Employee Alertline, a 1-800 hotline service administered by a third-party vendor. The Alertline's record of a call made by Plaintiff on September 23, 2005, purports to contain Plaintiff's statement that she "pulled out half of the files on her list" before she was sent to a computer training class. (Smith-Hill Aff., Doc. No. 42, Ex. N at 4.) Defendant also

points to Ms. Holder's affidavit, in which Ms. Holder states the fact that Sharon Williams, Plaintiff's witness at a hearing before the Employment Security Commission, testified that she, not Plaintiff, pulled the medical records charts on the morning of September 23, 2005. (Holder Aff., Doc. No. 45, at ¶ 15.) The Alertline exhibit and Ms. Holder's affidavit are clearly in conflict with Plaintiff's affidavit. But it is exactly this sort of conflict, where the finder of fact must determine which source is credible and which is not, that is reserved for the jury. When Defendant declares that there "is no credible evidence before the Court that [Defendant's] legitimate, non-discriminatory reasons were pretextual," (Doc. No. 56 at 3) it ignores the fact that it is not the Court's place to make determinations of credibility when ruling on a motion for summary judgment. Plaintiff's affidavit, when viewed in the light most favorable to Plaintiff, could persuade a reasonable jury that she did, in fact, pull the medical records charts as required. Based on this determination, a reasonable jury could then determine that Defendant's ultimate reason for Plaintiff's termination, the failure to pull those very same charts, was a mere pretext for discrimination.[5] Indeed, at this stage in the proceedings the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe," Reeves, 530 U.S. at 154, or in other words, all evidence for which the nonmoving party has presented contradictory evidence of her own. Because Plaintiff has presented

---

[5]Defendant argues that failing to pull the medical records charts was but one incident in a series of insubordinate behavior that led to Plaintiff's discharge. For example, Defendant points to the oral warning on September 16, 2005. This warning, however, includes "the pulling of the charts every AM according to the guidelines." (George Aff., Doc. No. 41, Ex. B.) Thus, the oral warning is tied up in the dispute regarding the medical records charts. Most importantly, Plaintiff's discharge form, under "Explanation," states, "On 9/16 and 9/21, it was explained to [Plaintiff] the importance of following the written guidelines. . . . Again on 9/23/05 at 2:30, the charts had not been pulled for Monday, no records had been requested from the hospital." (George Aff., Doc. No. 41, Ex. D). Given these statements, it seems clear that Plaintiff's termination was inextricably tied to Defendant's belief that she was not pulling the medical records charts as required by the guidelines.

evidence contradictory to Defendant's proposed nondiscriminatory reason for Plaintiff's termination, and because the Court must disregard Defendant's conflicting evidence, the Court concludes that there is an issue of fact as to whether Defendant's reason for Plaintiff's discharge was pretextual.

Assuming that there is an issue of fact as to pretext, Defendant next argues that this issue is neither genuine nor material, and thus insufficient to avert summary judgment. As the United States Court of Appeals for the Fourth Circuit has stated:

> Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'

Holland v. Washington Homes, Inc., 487 F.3d 208, 216 (4th Cir. 2007) (quoting Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006)). It can hardly be said that Plaintiff's affidavit, when taken as true, focuses on a "minor discrepancy" or raises a point that is "wholly irrelevant" to her termination. Taken as true, Plaintiff's affidavit shows that she did, in fact, pull the medical records charts on the morning of September 23, 2005, as well as every other morning. If this is the case, Defendant's ultimate reason for her termination falls away. Without that reason, a reasonable jury could infer, after hearing the evidence from Plaintiff's prima facie case, that Defendant targeted Plaintiff and eventually terminated her because of her race and/or age. This conclusion is neither inevitable nor unreasonable, and it therefore lies properly within the province of the jury. Accordingly, the Court holds that there is a genuine issue of material fact regarding Defendant's proffered reason for Plaintiff's termination, namely whether it is a pretext for race and/or age discrimination.

## B. Retaliation

"The test for proving prima facie retaliatory discharge requires that (1) plaintiff engaged in protected activity . . . ; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action." Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998). Defendant only contests the satisfaction of the third element, arguing that Plaintiff's complaints—and Defendant's knowledge of those complaints—and her discharge lacked a sufficient "temporal proximity." Plaintiff made frequent use of Defendant's grievance process, beginning with an August 13, 2005, call to the Employee Assistance Program, but also including calls to the aforementioned Alertline and to Defendant's Employee Relations department. The first indication that Defendant knew about Plaintiff's complaints is a notation made by Ms. George on September 21, 2005. Ms. George's "additional notes" from that meeting include a statement from Plaintiff that "Employee Relations would be contacting me and that I would see I was being unfair." (George Aff., Doc. No. 41, Ex. C at 2.) Causation cannot be shown unless the plaintiff can show that the defendant actually knew about the complaint. See Causey, 162 F.3d at 803. Thus, although Plaintiff's complaints began in August 2005, the crucial date for retaliation is the date that Ms. George became aware of those complaints: September 21, 2005. The lapse of two days between this knowledge and Plaintiff's termination hardly supports Defendant's argument that there is a lack in temporal proximity. See id. (holding that a thirteen month lapse between plaintiff's complaint and his termination does not support a causal connection) (citing Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir.1997) (holding that a four month lag does not support causation)). The Court is of the opinion that a two-day interval between Defendant's knowledge of

Plaintiff's complaints and Plaintiff's termination is sufficient to satisfy the causation element of the prima facie case. Thus, Plaintiff has established a prima facie case of retaliation.

As with Plaintiff's discrimination claims, the burden now shifts to Defendant to proffer a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant has made such a showing, as detailed above, and it falls once again to Plaintiff to demonstrate that Defendant's reason for her termination is a mere pretext for retaliatory discharge. Plaintiff's affidavit is sufficient in this context, as it was with discrimination, to create a genuine issue of material fact as to whether Defendant's proffered reason is mere pretext. The Court must take Plaintiff's allegations as true, and assuming Plaintiff pulled the medical records charts on September 23, 2005, as she did throughout her employment with Defendant, a reasonable jury could conclude that Defendant's reasons for Plaintiff's termination were illegitimate and pretextual. Thus, Plaintiff has satisfied her burden to avert summary judgment on her claim of retaliation.

## CONCLUSION

Plaintiff has established a prima facie case for race discrimination, age discrimination, and retaliatory discharge. Defendant has presented a legitimate, nondiscriminatory explanation for Plaintiff's termination. Plaintiff has presented sufficient evidence—in the form of her affidavit—such that a reasonable jury could find that Defendant's ultimate reason for her termination was mere pretext for race and/or age discrimination and retaliation. Plaintiff has not, however, established a prima facie case for gender discrimination.

Accordingly, the Court holds that there are no genuine issues of material fact as to Plaintiff's gender discrimination claim and that Defendant is entitled to summary judgement as a matter of law as to that claim. However, the Court holds that Plaintiff has presented a genuine issue of material

fact regarding her claims of race discrimination, age discrimination, and retaliatory discharge, namely whether Defendant's proffered reasons for Plaintiff's termination were pretextual. Therefore, Defendant's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.  Signed: June 2, 2008

Frank D. Whitney
United States District Judge